Turley, J.
delivered the opinion of the court.
On the 30th day of July, 1844, Hugh L. McClung and William B. French made their promissory note, by which they promised four months after the date thereof, to pay to Matthew McClung, or order, thirty-six hundred and ninety dollars, negotiable and payable at the branch of the Union Bank of the'State of Tennessee, at Knoxville. This was an accommodation note drawn for the benefit of the makers, Hugh L. McClung and Wm. B. French, and endorsed for them without consideration, by Matthew McClung and Campbell Wallace, and which was discounted by the bank and the proceeds placed to the credit of the drawers. This note at maturity was dishonored and regularly protested for non-payment and due notice thereof given to the endorsers.
On the 11th day of September, 1846, a summons was sued out of the Circuit Court Clerk’s office for the county of Knox, bearing test 2d Monday in June, 1846, by the Union Bank, against the makers arid endorsers of said note, by which a joint action of debt was commenced against them for the sum specified therein, together with all costs *99 and damages. At the return term of the process a declaration was filed in due form against all the defendants, jointly. The defendants severed in their pleadings. The defendants, Hugh L. McClung and Wm. B. French pleaded nil .debet. The defendant, Campbell "Wallace, pleaded 1st. nil debet; 2d. That the note had not been duly protested; 3d. That he had not been duly notified of the demand of payment of the note, and the dishonor thereof; and 4th. That the bank, the holder and legal owner of said note, contracted and agreed, for a valuable consideration, with the makers, to give further indulgence, and delay the time of the payment of the same, which indulgence and delay were accordingly given, all of which was without the consent of the defendant. The defendant, C. McClung, administrator of Matthew McClung (he having died after the endorsement and discount of the note, and before suit was brought) pleaded: 1st. That he doth not detain the sum demanded, nor any part thereof; 2d. That the note was not duly and legally protested for non-payment; 3d. That he was not duly and legally notified of the demand of payment of said note, and its dishonor; 4th. That the bank, after it became the holder and legal owner of said note, contracted and agreed, for a valuable consideration, with the makers, to give further indulgence, and to delay the time of payment, which indulgence and delay were accordingly given; and that this indulgence and delay were given without the knowledge or consent of. the said M. McClung, deceased, in his lifetime, or of his executor since his death.
On the plea of nil debet, filed by H. L. McClung and W. B. French, the drawers, there was issue jointly made up: so was there upon the three first pleas separately pleaded by the other two defendants, Campbell Wallace and C. M. McClung, administrator. (
*100 To the fourth plea of Campbell Wallace, the plaintiff replied, “that it did not contract and agree, for a valuable consideration, with the makers of said promissory note, to give them further indulgence, and to delay the time of the payment of said note, and did not accordingly give such indulgence and delay in the manner and form as alleged in the plea.” Upon which replication there was issue.
To the fourth plea of C. M. McClung, administrator, the plaintiff likewise replied, “that it did not contract and agree, for a valuable consideration, with the makers of said promissory note, to give further indulgence, and delay the time of the payment thereof, and did not accordingly give such indulgence and delay, in manner and form, as alleged in the plea.” Upon this replication there was also an issue.
Afterwards, viz, at the February term, 1847, of the Circuit Court of Knox county, a jury was empannelled to try all the several issues thus made up between the plaintiff and several defendants, which jury returned a verdict by which the plea of nil debet pleaded by the defendants, .Hugh L. McClung and Wm. B. French, the makers of the note, was found against them, and the debt and damages due the bank assessed, for which there was judgment against them; and by which all the issues, joined upon the several pleas of the other two defendants, C. M. McClung, administrator, and Campbell Wallace, the endorsers, were found in their favor: upon which there was judgment that they go hence and recover their costs. The defendants, Hugh L. McClung and Wm. B. French, being satisfied with the verdict and judgment, so far as they were concerned, have taken no exception thereto. But the bank, being dissatisfied with the finding of the jury upon the issues between it and the other two defendants, the endorsers, C. M. McClung, administrator, and ^Campbell Wallace, moved the Court *101 for a new trial thereon; which motion was overruled, whereupon a bill of exceptions was signed, and an appeal in the nature of a writ of error is prosecuted to this court by the bank against said 0. -M. McClung, administrator, and Campbell Wallace. The first question presented for the consideration of the court upon the writ of error arises upon a motion to dismiss the appeal upon the ground, that no motion for a new trial can be legally made against a part of the defendants, in favor of whom a verdict has been rendered, without also setting aside the verdict in favor of the plaintiff against the other two defendants, or, in other words, that inasmuch as the plaintiff has chosen to hold to his verdict as against Hugh L. McClung and Wm. B. French, the drawers, and judgment thereon, he shall not have a motion for a new trial as to the other defendants, C. M. McClung, administrator, and Campbell Wallace, the-endorsers, and that it was no error, therefore, in the Circuit Judge to overrule such motion, because a verdict, is an entire thing and cannot be good in part and bad in part, and cannot be set aside in part and retained in part.
That this is true as to verdicts in actions against joint defendants upon contracts at common law, cannot, as we apprehend, be questioned, because in such cases all the different persons being chargable in the same right and to the same extent, constitute in estimation of law one defence, upon which there can be but one verdict and one judgment; and these must be against all the defendants, because all being equally liable, each one has the right of contribution from the other to the full extent of his liability, and of consequence a verdict of acquittal as to one was a verdict of acquittal as to the other. A verdict therefore, in such cases, against some of the defendants and in favor of others, was an irregular verdict, upon *102 which no judgment could be given in favor of the plaintiff; and a new trial was necessarily a new trial as to all, because the defence is joint, the issue is joint, upon which there can be but one verdict, one judgment and one satisfaction. But this principle of the common law has been greatly interfered with in our State by statutory provisions, and to such an extent, as to render it difficult of application even in cases of joint actions against defendants, chargable in the same right, and to the same extent, for, by statute, the principle of the common law, that a failure against one joint defendant is a failure as to all, is repealed, and a plaintiff may now have judgment in such cases against such of the defendants as he can charge by a verdict, notwithstanding others may be discharged by the same verdict. Whether this change of practice would, in such cases, warrant the granting a new trial to the plaintiff as to those who had been discharged by the verdict, without also setting aside the verdict as to those who had been charged by it, is a question not without its difficulties, but unnecessary to be discussed, as we think, in the present case. For this, though in form a joint action, is in reality not so: there are three separate parties in this suit, not liable to the plaintiff in the same right, nor to the same extent, and without privity of contract. The first are Hugh L. McClung, administrator, and Wm. B. French, the drawers of the note; they are directly responsible. The second is the representative of Matthew McClung, deceased, the first endorser; he is collaterally responsible; and the third is Campbell Wallace, the second endorser, who is also collaterally responsible. The idea of uniting these three as defendants in one action, would have shocked any old common law special pleader: he would have considered it a symptom of derangement. But it has been done by *103 statute. A statute, however, though it may alter the practice, cannot alter the nature of the different liabilities under which these defendants are charged, and constitute them one and the same, as are liabilities upon which joint actions are maintainable at common law. It may, therefore, give the joint action without making the liabilities joint, as it has done in this case. There is no community of interest whatever between these three classes of defendants: on the contrary, their positions are, to a great extent antagonistic to each other. It is to the interest of Matthew McClung and Campbell Wallace that there shall be judgment against Hugh L. McClung, administrator, and Wm. B. French, because, if they pay as drawers, they as endorsers, are discharged: it is to the interest of Campbell Wallace as last endorser, that there shall be judgment against the estate of Matthew McClung, for if he pay as first endorser he, Campbell Wallace, is discharged as second endorser. They have, then, not only no community of interest, but no community of defence. Indeed, they do not join in defence, but each one pleads for himself. C. M. McClung, administrator, and Campbell Wallace, then, cannot be injured by the verdict which has charged Hugh L. McClung and Wm. B. French: on the contrary, as has been said, they are benefitted thereby. Why, then, shall they be heard to complain that the verdict against them was not set aside before there was a motion for new trial? only because as it is argued, it is a principle of the common law, that in joint actions there must be an entire verdict, and if it be set aside as to some, it must necessarily be set aside as to all. Now, we have seen what the reason is for this rule of the common law, viz, that there is in such cases a community of both interest and defence, and that, therefore, a different rule could not consistently prevail. But how *104 shall this rule be applied to cases where a joinder in actions is the creature of arbitrary enactment, and there is no such community between the defendants? There is no reason why it should. A question very similar in its bearings arose in the case of Sherrell vs. Goodrum, and others reported in 3d Hump., 419. It was there argued that a judgment is entire, and being void as to some of the parties is necessarily void as to all. That was a case of a judgment by motion against a Sheriff and his sureties: the judgment against the sureties was void, and it was argued that this avoided the judgment as against the Sheriff. In discussing the. proposition, the Judge who delivered the opinion, said: “We deem it unnecessary to enter into a minute investigation of the common law doctrine as to the nature of judgments. What defects will vitiate them when, if eyer, they may be '’sustained in part, and set aside in part. All the learning upon that subject resting upon the inflexible principle, that things not perfectly homogeneous, shall not form the subject matter of a judgment, that persons not interested in the same subject matter, in the same character, and upon the same principles, shall not be joined as parties, and that a failure to recover a judgment against one shall be a failure as to all; it necessarily follows that a judgment both as to its subject matter and its parties was, so entire that it could in no point be severed, and that if it were bad in part, it would be bad in the whole.
“But such modifications have been made by statute in more modern times, to suit the convenience of trade and commerce, and the many varied relations arising out of them, producing such a variety of shades of interest in the same transaction, and amalgamating them together in the same remedy, that cases are constantly arising in which *105 parties who would not have been permitted under any circumstances, by the common law, to join in their action, now do so readily; and subject-matters of controversy, joined only by a collateral thread, and which the common law pleader would never have thought of uniting, are now readily embraced by the same declaration, so that it would be found not only injurious, but destructive of. the rationale of correct pleading to apply the same restricted principle to them. Such are our joint actions against the makers and endorsers of bills of exchange .and promissory notes, all our judgments on motion against sheriffs, coroners and constables, and their sureties, and judgments on motion against sureties for appeals from an inferior to a superior tribunal. In all these cases some of the parties are directly liable, and some collaterally. Suits might be brought and judgments obtained in all. -such cases against those who were directly liable, without noticing those who are collaterally bound, but to avoid circuity and expense, the contrary course is permitted. You may take your judgment against a drawer of a bill of exchange alone; you may take it jQintly against him with the endorsers; a failure to obtain it against the endorser does not prevent your having it against the maker, though they be sued jointly. In the case of motions against sheriffs apd other officers, they are principals responsible for their own conduct; you may take judgment against them’without noticing their sureties, and it is valid; but for greater security, judgment is also taken against the sureties. If the judgment against them shall be valid, how shall it vitiate the judgment against the principal? Can it make that bad which would have been good if there has been no such judgment? Surely not.”
The reasoning in this case, though applied to the case of *106 a judgment good in part and bad in part, is, in our opinion, equally applicable to verdicts in cases of tbe character now under consideration. A jury is sworn to try issues made up between a plaintiff and the drawers and endorsers of a bill of exchange; they return a verdict against the drawers but in favor of the endorsers. This verdict may be correct as to the drawers and incorrect as to the endorsers, and vice versa. What shall prevent it being considered a good verdict so far as it is found according to the evidence, and bad so far as it is found against it? And why shall a court before granting a new trial as to those against whom it has been illegally found, be compelled to set it aside as to those, against whom it has beep legally found, there being no connection of interest or defence between them? We can perceive none whatever. We therefore think upon the first point, that the appeal has been properly prosecuted in the case to this court, as to the defendants, C. M. MeClung administrator, and Campbell Wallace, the endorsers, without having set aside the verdict and judgment against Hugh L. MeClung and Wm. B. French, the drawers, which had been rendered in the Circuit Court, The second question presented for our consideration arises upon the judgment of the Circuit Judge overruling the motion for a new trial of the issues between the defendant, C. M. MeClung, administrator, and Campbell Wallace, and the plaintiff.
We have seen from the pleadings that there were three issues made up between the parties litigant, all of which were found for the defendants, but it is only as to the last that any dissatisfaction is expressed. That issue involved the question whether there had been any contract between the bank and the defendants, the drawers of the promissory note, w'hereby time had been extended for the payment thereof. The jury found that there had been such a *107 contract, and a consequent extension of time for payment without the consent of the endorsers. And the only question now is, whether there is testimony upon which the finding can he sustained; the decisions. of this court having uniformly been to the effect that where there is, we will not set aside the verdict, where the Circuit Judge has refused to do so. The bill of exceptions in this case shows that the promissory note, which is the foundation of this action, was protested for non-payment at the instance of the bank, whieh was the holder, on the 3d day of December, 1844, and notice thereof given to the endorsers. After these steps were taken the note remained in bank, without further proceeding thereon, or any notice taken of it, so far as appears from the bills of exceptions, until the 22d day of September, 1845, when Hugh L. McClung, one of the drawers, addressed a letter upon the subject thereof, to the President and Directors of the bank, in substance as follows: “I have been informed that in the absence of some explanation in relation to the matter, some surprise, and perhaps dissatisfaction -exists in your board, that the notes drawn by McClung and French, and endorsed by my brother,' Matthew McClung, should remain unpaid. I assumed individually the payment of these notes. My calculations have been to pay these notes out of my individual-means, and I have looked to the proceeds of the sale of the steamboat Frankland’as those which would at the earliest day come into my hands. I believe, independent of the boat, that Mr. Van is entirely good for the amount of his note; but to make assurance doubly sure I have taken a lien upon the boat, with the privilege of insuring her for my own benefit, and have her now insured for four thousand dollars. Mr. Van thought during the fall he would be able to make me a heavy payment, but I have no right to *108 demand payment till Ms note matures, which will be early in February next. I hope this explanation will be satisfactory, with the assurance that my best exertions shall be made for the speedy liquidation of the claim.”
Nothing further appears to have been done by the bank touching the claim, till the 30th of March, 1846, when, as is shown by the minutes of the board of directors, a committee of three were appointed to examine all notes under protest, and report to the board at its next meeting for their action on the subject, which committee made report on the 7th of April, 1846, recommending that certain bills and notes be placed in the hands of the bank attorney, for collection, and that certain other notes, among which were those of MeClung and French, take the same course, unless satisfactorily arranged before time to bring suit at the coming June term of the Circuit Court of Knox. On the 23d day of May, 1846, Hugh L. MeClung again addressed a letter to the board upon the subject of these notes, in which he says in substance: “I left home three months since under the belief that I should realise on a claim of $8,500 due me by James S. Van, an amount sufficient to pay the balance due on the two notes due your bank, on which my deceased brother was an endorser. Failing to receive anything from Van, before leaving Alabama, I wrote to his father-in-law and partner, Lewis Ross, who is a man of great wealth, offering him the claim for his six months acceptance, for $6,000. I have not had time yet to hear from Mr. Ross. Should he accede to the proposition, Í will at once pay the debt. This state of things existing, I have just learned with regret, that your cashier has been directed to place these claims in the hands of an attorney for collection. These instructions I trust you will revoke for the present, as I may, before *109 another court, be able to pay the debt. In the mean time, Judge Alexander will have returned, and Calvin M. MeClung, my brother’s administrator, will visit this place, and I think among hands, we can make such arrangements as will give satisfaction to all parties.”
On the 26th day of May, .1846, as appears from the minutes of the board, an order was made in substance as follows: “Because it is suggested to the board that all the parties in the case of the MeClung and French notes cannot be served with process before the coming Circuit Court, the notes are not required to be handed out by the cashier for collection, unless on conferring with the bank attorney he should be advised that the delay would jeopard the safety of the claim.” And on the 2d day of June the cashier reported to the board that he had had a conference with the bank attorney, who advised that in his belief a delay to commence suit on said notes at the ensuing Circuit Court would not jeopard the safety of the notes.
The bill of exceptions further shows that A. M. White, the Cashier of the bank, was examined as a witness, and proved in substance, that Hugh L. MeClung, before the notes, the subject-matter of this controversy, fell due, had proposed that said notes should remain in bank without renewal, and he be permitted to pay the calls and interest upon them as though they were renewed regularly, and that his name should not be dishonored thereby in bank. This proposition was known to the directors, but no action was taken upon it, nor did witness agree that he would do so. There were other notes in bank to which Hugh L. MeClung^ was a party, and which were renewed after the protest of the note in controversy, and it was considered by the board that the name of Hugh L. MeClung was not dishonored by *110 said protest, and that in the opinion of the witness, the rule dishonoring the name of persons under protest was not enforced against McClung in consequence of his said request. Witness also proved that on the 29th day of November, 1844, he received from Hugh L. McClung as a part-payment of the note sued on $165, and $4 78 cost, and $29 10 interest accruing up to the 19th day of March, 1845, ensuing, but that he did not make any promise or agreement at that time that the payment of the note-should be postponed, or that suit thereon should be delayed; and also that there had been no contract or agreement between the board and McClung for the delay of payment or the non-collection of the debt by suit.
This is the substance of the proof upon the issue, the finding of which is sought to be set aside by the plaintiff as being against evidence.
Let us sum up the results as established by this proof. The note was dishonored on the 3d day of December, 1844, by protest. On the 19th day of November, 1844, before the note was dishonored, the cashier of the bank received in part-payment thereof, the sum of $165 principal, and the further sum of $29 10 interest, calculated up to the 29th day of March, 1845, ensuing. Previous to this payment of principal and interest, McClung had proposed to the bank, to let said notes remain in bank without renewal, and he be permitted to pay the calls and interest upon them as though they were renewed regularly, and that his name should not be dishonored thereby. Now, it is the fair inference that this payment of debt and interest was made in compliance with this proposition. The note was near maturity when it was made, and if the payment were not intended to be in satisfaction of a call of principal and interest, as if the note had been actually renewed, why pay interest in *111 advance? If it were not intended that the note should ran another four months, why receive accruing interest for those four months? It is true that "White, the cashier, proves that there was no contract or agreement between either the board of directors or himself and McCIung that the note should continue to run upon the payment of such call and interest, but then he manifestly means an express contract to that effect, for that both he and the directors tacitly acceded to the proposition of McCIung, is, we think, incontrovertible, otherwise, why, in violation of a well known bank custom continue to renew other paper upon. which was the name of Hugh L. McCIung? Why not have dishonored him as they dishonored others? The cashier himself tells us that he believes that it was because of this proposition. Then, these two facts, viz, the reception of the interest in advance for four months, and the continuation of Hugh L. McClung’s credit in bank, are, in our opinion, sufficient evidence of a tacit acceptance of his proposition that the notes should lie over without renewal upon the payment of call and interest at four months, and this to be done without dishonoring his name. It seems to us that the reason the arrangement was made was this: Matthew McCIung, the first endorser, was dead; it was, therefore, found difficult to renew the note, as the bank vyas either unwilling to substitute another endorser in his place, or it might not have been convenient for the drawers to procure one, and it was convenient that delay might be procured by protesting the note, fixing the liability of the endorsers, and then permitting it to remain in bank without renewal, upon the drawers continuing every four months to pay up call and interest, as they would have had to do if the note had been regularly renewed; and it was supposed that such an arrangement could be *112 effected without danger of releasing the endorsers, provided the bank entered into no express contract with the drawers for such delay. It is not necessary that there should be a positive agreement to accept of the proposed terms of a contract; an implied one will do, and this implication is fairly inferable, where the parties proceed and act upon the proposed terms (as in this case) in the manner they woiild have done, provided there had been an express agreement to that effect. The reason why the holder of a note or bill shall not contract for delay with the maker without discharging the endorser is because such contract is to the detriment of the endorser. To hold that he may give such delay upon an implied agreement, and receive in advance his accruing interest for such delay, without releasing the endorsers, would be to deprive them of a principle of security guarantied to them by law, and this upon a mere quibble. Now, in this case, if the bank, when it received the partial payment and the accruing interest, had in usual form of business renewed the note, the endorsers would have been discharged, because others would have been substituted in their 'place; and shall it be heard, that all the effect of a renewal shall be had by tacit consent, without the knowledge or consent of the endorsers, and they be still held responsible? Such a holding would be shocking to common sense.
Under all the circumstances of the case then/ we think that the jury were warranted in finding the verdict they did upon the issue; that there is sufficient pi;oof; and that the Circuit Judge committed no error in refusing to grant the plaintiff a new trial, and we therefore affirm the judgment.